UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

PIKE CNTY. FISCAL CT., *et al.*,      )
                                      )
      Plaintiff,                      )
                                      )      No. 7:20-CV-75-REW-EBA
v.                                    )
                                      )      OPINION AND ORDER
RCC BIG SHOAL, LLC, *et al.*,         )
                                      )
      Defendants.                     )

                        **\*\*\*   \*\*\*   \*\*\*   \*\*\***

Plaintiffs want their money back. In 2014 they loaned $400,000 to RCC Big Shoal to help develop a natural gas to synthetics refinery in Pike County. *See* DE 48-6 at 195 (Farmer Dep.). The principal was due—plus 25% annual compound interest—in August 2017. *See* DE 48-2 at 16 (Note Purchase Agreement). To date, RCC Big Shoal has only repaid $100,000 of the outstanding sum. *See* DE 36 at ¶ 26 (Responses to Admission). Plaintiffs, armed with a state court judgment for the remaining $300,000 (plus interest), now move for summary judgment to pierce the corporate veil and hold the LLC's two upstream owner/operators—defendants David L. Farmer and William B. Johnson—personally liable for the unpaid money. *See generally* DE 44 (Second Amended Complaint); DE 48 (Plaintiffs' Motion for Summary Judgment). Defendants responded, claiming summary judgment was appropriate—but for themselves, not Plaintiffs. *See* DE 49 (Defendants' Motion for Summary Judgment). Fully briefed (*see* DEs 50, 52), the cross-motions are ripe for review.

Here, Plaintiffs invested in a start-up and secured no personal guarantees from the principals. However, the parent-LLC owners, on undisputed facts, essentially treated the LLC as

their discretionary source of living expenses for the course of several years, thus emptying the LLC of funds. Allowing the corporate wall to protect the members would, on this record, work injustice. The Court **GRANTS** the Plaintiffs' motion and **DENIES** that of Defendants.

## I. Summary Judgment Standard of Review

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must consider the nonmovant's evidence and draw all justifiable inferences in the nonmovant's favor. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009).

The burden of establishing the absence of a genuine dispute of material fact initially rests with the moving party. *See Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986); *Lindsay*, 578 F.3d at 414. If the moving party meets its burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Celotex Corp.*, 106. S. Ct. at 2253; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). Thus "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 106 S. Ct. at 2552.

A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2510 (1986). Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 2511; *Matsushita Elec. Indus. Co.*, 106 S. Ct. at 1356. Such evidence

must be suitable for admission into evidence at trial. *See Salt Lick Bancorp v. FDIC*, 187 F. App'x 428, 444–45 (6th Cir. 2006).

The summary judgment standard remains the same where the parties pursue cross-motions; the Court "must evaluate each party's motion on its own merits" and, in doing so, "draw all reasonable inferences against the party whose motion is under consideration." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) (citation omitted); *accord Lansing Dairy Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

The Court notes that the veil-piercing theory is a matter of equity, for the Court's, not a jury's, resolution. *See Schultz v. Gen. Elec. Healthcare Fin. Servs. Inc.*, 360 S.W.3d 171, 175–76 (Ky. 2012) ("We adopt the reasoning of the *Daniels* decision and hold that the doctrine of piercing the corporate veil arises in equity."). Still, applying the typical Rule 56 rubric, the Court queries for a genuine dispute of material fact. On this record, the parties argue over the effect but not the state of the facts. The Court finds that the record impels judgment in Plaintiffs' favor.

## II. Facts

Defendants Farmer and Johnson wanted to build a GTL refinery. *See* DE 49-4 at 2 (Project Description). After scouting various locations, they believed Pike County, Kentucky, would provide a suitable site. *See id.*; *see also* DE 49-1 at 5 (Memorandum in Support of Defendants' Motion for Summary Judgment). Farmer and Johnson had learned that Pike County was interested in energy investment in the area, *see* DE 48-6 at 210 (Farmer Dep.). They presented the Pike County Fiscal Court with a business plan. *See* DE 49-4. The proposal forecasted a project timeline from April 2014 until October 2016. *See id.* at 12. The Pike County Fiscal Court invested $400,000 into the project in August 2014 via a Note Purchase agreement with RCC Big Shoal—the LLC through which Farmer and Johnson orchestrated the project. *See* DE 48-2 at 15. The $400,000 loan

3

was targeted. The sum was intended for "engineering, permitting, legal, and other working capital costs purposes for a project to produce synthetic fuel products to be located in Pike County, Kentucky." *See id.* at 2. Also, under the executed Convertible Promissory Note, RCC Big Shoal was to repay the principal $400,000 plus 25% annual compound interest by no later than August 2017, with payment to the Pikeville/Pike County Industrial Development Economic Authority. *See id.* at 16.

After obtaining $2,182,765 total through a mixture of funding sources, the individual Defendants spent the vast majority of it—including Plaintiff's $400,000—on their own salaries, travel, home office rent and equipment, and, of most concern, low-interest personal loans. *See* DE 48-6 at 88-136 (Farmer Dep.) (tracing Defendants' expenditures); *see also* DE 36 at ¶ 14; DE 48-5 (LLC's compiled Sources and Uses chart). None of that initial (or any other) money remains, and the entity in many ways (like not filing tax returns and not having assets or a bank account) is ostensibly defunct. The maturation date to repay Pike County Fiscal Court for its initial $400,000 injection came and went without full repayment. *See* DE 48-2 at 16. To date, Defendants have only repaid $100,000 of the outstanding principal, via a post-default payment in 2018. *See* DE 36 at ¶ 26; DE 48-21 (Summary of Debt). Further, Defendants—though expressing business optimism despite a hand-to-mouth existence—will no longer complete the project in Pike County. *See* DE 48-6 at 193, 209-210 (Farmer Dep.).

Plaintiffs commenced litigation in Pike Circuit Court for the remaining $300,000 plus 25% annual compound interest. *See generally* DE 1-2 (Pike Circuit Court Opinion, Order & Judgment). They succeeded. *See* DE 1-2 at 4. Despite obtaining a judgment, though, the debt remains unsatisfied. *See* DE 44 at ¶ 11. Thus, Plaintiffs in this case seek to pierce the corporate veil

(Count II) of two limited liability companies[1] and hold Defendants Farmer and Johnson personally

liable for RCC Big Shoal's debt because, in Plaintiffs' eyes and per the *Inter-Tel* rubric, these

LLCs are merely alter-egos or instrumentalities of the individual Defendants, being used

inequitably to shield Defendants from outstanding debts. *See* DE 48; *see also* DE 44 at ¶ 13.

Defendants argue summary judgment is warranted, but in their own favor because "Plaintiff has

failed to sustain its burden and its claim fails as a matter of law." *See* DE 49-1 at 30.

## III. Discussion

Kentucky courts allow piercing of an entity's corporate veil so that "the debt of the pierced

entity becomes enforceable against those who have exercised dominion over the [entity] to the

point that it has no real separate existence." *Inter-Tel*, 360 S.W.3d at 155. However, "[c]ourts are

reluctant to disregard the corporate entity." *Holsclaw v. Kenilworth Ins. Co.*, 44 S.W.2d 353, 355

(Ky. Ct. App. 1982).[2] To prevail on a corporate veil-piercing claim, a claimant must prove two

elements: "(1) domination of the corporation resulting in a loss of corporate separateness *and* (2)

circumstances under which continued recognition of the corporation would sanction fraud or

---

[1] Veil piercing is not thwarted by the number of entities dividing the corporation from the persons potentially liable when the intermediary entities are owned and controlled identically. *See Inter-Tel Techs., Inc. v. Linn Station Props., LLC*, 360 S.W.3d 152, 166 (Ky. 2012) ("Where such entities have acted in concert without regard to their own corporate separateness to achieve the unjust results that veil piercing protects against, any insistence on sequential piercing necessarily falls on deaf ears."). *Inter-Tel* is the seminal Kentucky Supreme Court case and involved piercing the veil of a grandparent and parent corporation to reach the subsidiary. *See Inter-Tel*, 360 S.W.3d at 166. Similarly, here, Plaintiffs ask the Court to sequentially pierce two levels of corporate separation. *See* DE 44 at ¶¶ 11-14. Also, as previously noted, because the Kentucky Supreme Court has blessed the corporate veil piercing doctrine for LLCs, *see Pannell v. Shannon*, 425 S.W.3d 58, 75 n.15 (Ky. 2014), the Court will apply the equitable doctrine to RCC Big Shoal and RCL Chemical Conversion. *See also Pike Cnty. Fiscal Ct. v. RCC Big Shoal, LLC*, No. 7:20-CV-75-REW, 2020 WL 6937444, at *2 (E.D. Ky. Nov. 24, 2020) (citing *Inter-Tel*, 360 S.W.3d at 155 and *Hodak v. Madison Capital Mgmt., LLC*, 348 F. App'x 83, 94-95 (6th Cir. 2009)).
[2] Indeed, *Pannell* teaches that, given the fundamental principles of corporate separateness, piercing is limited to "extraordinary circumstances." *Pannell*, 425 S.W.3d at 75.

promote injustice." *Inter-Tel*, 360 S.W.3d at 165 (emphasis in original). Eleven (or more) factors guide analysis on the first element:[3]

> (1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) nonpayment of dividends; (5) insolvency of the debtor corporation; (6) nonfunctioning of the other officers or directors; (7) absence of corporate records; (8) commingling of funds; (9) diversion of assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors; (10) failure to maintain arm's-length relationships among related entities; and (11) whether, in fact, the corporation is a mere facade for the operation of the dominant stockholders.

*Inter-Tel*, 360 S.W.3d at 163. However, within this list, three factors carry greater weight than the companion eight: "grossly inadequate capitalization; egregious failure to observe corporate formalities; and a high degree of control over the corporation's day-to-day operations and decisions." *Tavadia v. Mitchell*, 564 S.W.3d 322, 329 (Ky. Ct. App. 2018); *see also Inter-Tel*, 360 S.W.3d at 164.

As to the second element—fraud sanctioned or injustice promoted— "the injustice must be some wrong beyond the creditor's mere inability to collect from the corporate debtor." *Inter-Tel*, 360 S.W.3d at 164. But a plaintiff satisfies the second element if "the parent company cause[d] a subsidiary's liability and then render[ed] the subsidiary unable to pay the liability," or the defendants engaged in a scheme to "squirrel assets into liability free corporations while heaping liabilities upon an asset-free corporation." *Inter-Tel*, at 164 (quoting *Sea-Land Servs., Inc. v. Pepper Source*, 941 F.2d 519, 524 (7th Cir. 1991)). "[T]he trial court should state specifically the

---

[3] The veil-piercing doctrine originally applied to corporations but has since been analyzed against LLCs. *See Pannell*, 425 S.W.3d at 75. To account for the dissonance between the two organizing structures, the Court only applies the factors relevant to LLCs. *Inter-Tel* referred to a host of applicable considerations, all querying in some way levels of separateness or dominion.

fraud or injustice that would be sanctioned if the court declined to pierce the corporate veil." *Id.* at 165.

Concerning element one:

### *a. Loss of Corporate Separateness*

RCL Chemical Conversion was the sole member and (per the lone Operating Agreement in the record, *see* DE 49-8 (Operating Agreement)) the manager of RCC Big Shoal. Farmer and Johnson owned and controlled RCL. The two limited liability companies—RCC Big Shoal and RCL Chemical Conversion—ceased to operate separately from each other or from Farmer and Johnson, satisfying the first piercing element. Under the first factor, the Court normally must analyze capitalization only at entity formation. *Inter-Tel*, 360 S.W.3d at 167 (citing *Anderson v. Abbott*, 321 U.S. 349 (1944)). However, the Court may consider later undercapitalization if that status arose due to capital transfers to the controlling shareholder(s). *Id.* This exception applies here and, therefore, the Court considers RCC Big Shoal's present undercapitalization, not just the state of capitalization at creation.

RCC Big Shoal includes a single and managing member, RCL Chemical Conversion. *See* DE 36 at ¶ 8 (Responses to Second Requests for Admission); *see also* DE 48-6 at 25-26 (Farmer Dep.). Also, in the years leading up to the loan default, Farmer and Johnson were the sole members of RCL Chemical Conversion. *See* DE 36 at ¶ 9 (stating that a new member was added in 2020); *see also* DE 48-6 at 26, 29 (Farmer Dep.). Farmer and Johnson—the two sole or controlling members/owners of RCL Chemical Conversion—made all decisions governing RCL Chemical

7

Conversion in concert. *See* DE 36 at ¶ 12. These decisions included diverting at least $1,675,486[4] of the initial $2,182,765.00 capital to their own pockets. *See id.* at ¶¶ 16-25. These expenditures were initiated by and made to Farmer and Johnson and caused, as a matter of sequence and math, RCC Big Shoal's current insolvency. *See* DE 48-6 at 126, 134-139 (Farmer Dep.).

Perhaps the initial capitalization is debatable in the start-up context. Although, the Court notes that RCC has from inception been in a position where its outstanding debt far exceeded its stated assets. Regardless of initial capitalization, the sole shareholders—Farmer and Johnson via RCL Chemical Conversion—siphoned assets during the years following LLC formation and rendered RCC Big Shoal assetless and undercapitalized when its Pike debt came due. In other words, transfers to the principals led to the current status, with RCC Big Shoal hopelessly unable to meet incurred obligations. This first factor, therefore, favors finding lack of separateness between the deciders—Farmer and Johnson—and the purportedly separate RCC.

Defendants wholly failed to observe corporate formalities. Defendants maintain that RCC Big Shoal and RCL Chemical Conversion maintained corporate records throughout their existence. *See* DE 49-1 at 28. Although Kentucky law gives LLCs significant operational flexibility in KRS Chapter 275, requirements persist. Here, Farmer and Johnson documented no formal meetings and provided no written consents for member actions. Importantly, the Operating Agreement (DE 49-8) puts management under RCL but also requires written member consent as to certain acts (*e.g*, budget amendment and entry into long-term contracts). *See id.* §§ 6.2-6.4, 7.2. RCL has not, via Farmer and Johnson or otherwise, demonstrated the slightest in terms of formal or

---

[4] Plaintiffs allege Defendants took as compensation or quasi-compensation $1,795,086.00. However, Defendants denied the sum, leading to the discrepancy—that is the extra $122,500 to rent the individuals' home office space. *See* DE 36 at ¶¶ 17, 21.

documented actions. Further, RCL's operating mechanics, if any there be, are not before the Court. Suffice it to say that, other than occasional Operating Agreement amendments to reflect ownership changes, RCC did not document corporate governance or respect for even minimal formal requisites of entity separateness.

Tax behavior is another area lacking formal distinctness. The entities have existed since 2012 and 2014, yet neither LLC has filed a single tax return. These are delinquencies that undercut consideration of RCC as a standalone legal person. Farmer indicated that the two LLCs' tax returns were to be interdependent, perhaps indicating full integration. *See* 48-6 at 56-58 (Farmer Dep.); *Inter-Tel*, 360 S.W.3d at 157-158, 166 (highlighting that corporations filing interchangeable tax returns, as to a subsidiary, favors finding a lack of corporate separateness); *see also* DE 48-6 at 50-53 (Farmer Dep.); DE 36 at ¶ 15 (admitting RCC Big Shoal never paid state or local taxes).[5]

Additionally, because Defendants were the sole decisionmakers for RCL Chemical Conversion and, derivatively, RCC Big Shoal, they served in officer capacities for both, further indicating (or facilitating) structural identity and a lack of corporate formalities similar to *Inter-Tel*. *See* DE 36 at ¶¶ 9, 12; DE 48-6 at 25-26 (Farmer Dep.); *Inter-Tel*, 360 S.W.3d at 157-158. The formality issue is lower tier for LLC analysis, given the form's inherent flexibility. Still, there is no documentation of any meetings, any formal budget or bilateral contract approval, and any step that would signal RCC as a person distinct from RCL and its controlling member/owners, both of whom received the bulk of RCC's assets by way of remuneration over the years.

---

[5] Defendants' inaction eventually led the Delaware Division of Corporations to cancel the Delaware LLC due to the oversight, further highlighting the Defendants' failure to observe corporate formalities. *See* DE 48-6 at 48 (Farmer Dep.). Apparently, this persists. *See Rector v. Calvert*, No. 2013-CA-002057-MR, 2018 WL 2460361, at *3 (Ky. Ct. App. June 1, 2018) (noting the individual defendants failed to observe corporate formalities when they allowed the LLC to be administratively dissolved without attempting to wind up its affairs or reinstate the LLC).

9

The entity commingling also is problematic. For instance, it seems that RCC paid expenses that RCL incurred even *prior* to the formation of RCC. This appears in some of the meal or marketing costs attributed to RCL. *See* DE 48-8 (Jan 1, 2014, Receipt), DE 48-9 (Feb. 1, 2014, Receipt). This confirms the owners' use of one functional paying account, despite ostensible separateness. *See* DE 48-10 at 92 (Johnson Dep.) ("Because the idea was to keep all of the monies in and monies out through that one subsidiary[.]"). Further, at least once, RCC (the sub) paid corporate filing costs for RCL (the parent). *See* DE 48-6 at 143 (Farmer Dep.) ("Yes. We were paying RCL's agent fees, correct"). These are not extensive, in terms of dollars, but the issues show that Farmer and Johnson ran the firms without respect for corporate boundaries or designated roles of authority.

RCC Big Shoal is, without a doubt, insolvent.[6] RCC, with gauzy descriptions of its human assets and experience-based worth, shows no hard or capital assets. Its multiple liabilities would plainly overwhelm any RCC balance sheet. *See* DE 48-21 (documenting $4,274,926 in liabilities as of December 31, 2020). As Farmer indicated, "[RCC Big Shoal] ha[s] no physical assets." *See* DE 48-6 at 126 (Farmer Dep.). RCC Big Shoal lacks any money to repay its outstanding obligations. *See id.* at 237 (indicating RCC Big Shoal cannot pay its outstanding obligations). This includes the unpaid $300,000 state development loan balance—taxpayer money loaned by Pike County for a project that Defendants now "hope" to complete elsewhere.[7]

---

[6] Defendants provide a convoluted and nonserious definition of "insolvent" in the attempt to justify RCC Big Shoal's lack of assets alongside the outstanding debt. *See* DE 49 at 27-28. The Court rejects the creative accounting. RCC owes over $4 million and cannot even afford to keep open a bank account, complete its tax returns, or pay its historical vendors. It is insolvent.

[7] Additionally, Defendants are unable to pay multiple people that worked on the startup since its inception—including an accounting firm, consulting firms, individual people that helped along the way, the state of Delaware, Chevron, Defendants' registered agent in Kentucky, and Marwood Land Company, the owner of the anticipated refinery site. *See* DE 48-6 at 187-194 (Farmer Dep.).

The diversion of assets into Farmer's and Johnson's wallets, as a matter of scope and timing, heavily favors finding loss of separateness. Defendants took $406,400 in salaries during 2014 and 2015. *See* DE 36 at ¶ 16; DE 48-5 at 2. Also, between 2014 and 2018, they took at least $94,470 each to "rent" office space in their own homes. *Compare* DE 36 at ¶ 17 *with* DE 48-5 at 2. Defendants used $19,744 for meals and entertainment. *See* DE 36 at ¶ 24; *see also* DE 48-5 at 2. Additionally, Defendants incurred $222,183 for travel and lodging. *See* DE 36 at ¶ 25; DE 48-5 at 2. Seemingly without any formal step of documentation or authorization, Farmer and Johnson effectively used nearly all of the funds of RCC to fund their lives during the loan repayment term and just after the default in 2017.

The largest block of transactions provided Defendants nearly $1 million in multiple low-interest loans—requiring repayment only "upon 190 days from the full financial closing of an amount sufficient to construct and start up the RCC Big Shoal, LLC GTL project." *See, e.g.*, DE 48-11 (Jan. 26, 2018, Promissory Note). Defendants now claim these low-interest loans were actually salaries—despite separately receiving salaries for two years when they also received these low-interest loans. *See* DE 36 at ¶¶ 16, 18-19; DE 49-1 at 28 (claiming these loans were actually "hard-earned salaries"). Tellingly, Farmer and Johnson have never claimed these loans as income or salaries on their individual taxes. *See* DE 48-6 at 65, 84 (Farmer Dep.); DE 48-10 at 38-42 (Johnson Dep.). At execution, these loans could only have been authorized by Defendants on behalf of RCC Big Shoal to themselves in their individual capacity. Defendants, therefore, who fully controlled RCL, gave loans from the sub-entity they represented to themselves as individuals. The *individuals* had the discretion, per the text, to forgive such loans. In total, Defendants took out roughly $1.3 million in salaries and loans between 2014 and 2018. *See* DE 48-6 at 82-84 (Farmer Dep.). None of the loans have been repaid. *See id.* at 84. Thus, the transactions depict officers who

unabashedly manipulated and funneled corporate funds for personal enrichment (and to the detriment of waiting third-party creditors).

Farmer and Johnson failed to maintain arms-length relationships with the two LLCs. As previously discussed, Farmer and Johnson both executed sham notes to siphon assets from the LLCs. The notes, masquerading as low-interest loans, are not predictably due and may be forgiven over time at the discretion of the Borrower. *See, e.g.*, DE 48-11 at 1. Again, the insider tax manipulation is telling. Farmer and Johnson, *e.g.*, created the loans to avoid recording them as taxable individual salary. *See* DE 48-6 at 65 (Farmer Dep.); DE 48-10 at 42 (Johnson Dep.). They also maxed out the IRS home-office square foot calculation, endeavoring to create an untaxed transfer. *See* DE 48-6 at 103. But, in terms of tax compliance for the LLCs, the officers have not caused the filing of LLC returns at any point, creating a noncompliance and penalty issue for the entities. *See id.* at 52. This shows control over tax mechanics that benefitted the individuals but was a detriment to, and created liability for, the entities. Finally, as previously discussed, Farmer and Johnson were the only officers and the controlling owners of the LLCs during the relevant time period.

Considering all the relevant factors at *Inter-Tel* step one, the Court finds that Farmer and Johnson dominated the entities to the point of, and resulting in, loss of corporate separateness. The Court has surveyed all pertinent factors. Keys are the inadequate capitalization and the reasons and sequence leading to that state, the total absence of LLC governance, the firms' insolvency, the lack of documentation and records, the commingling of funds and entity interpayment, the diversion of assets through sham loan and doubtful home-office payments, and the tax manipulation and noncompliance relative to LLC accounting. Johnson and Farmer pulled the entity levers and dominated both LLCs. The paper companies, now defunct, were mere facades for the operation of

12

the dominant owners. The Court sees no genuine dispute of material fact and finds element one established under the Rule 56 rubric.

Concerning element two:

*b. Injustice Promoted*

Plaintiffs must identify a tangible fraud sanctioned or injustice promoted by refusal to pierce the corporate veil. *See Inter-Tel*, 360 S.W.3d at 165. The injustice or fraud cannot rest merely on the inability of a creditor to secure payment. *See id.* at 164. However, as the Kentucky Supreme Court highlighted in *Inter-Tel*, other circumstances besides fraud may merit piercing the corporate veil, including:

> [W]here a party would be unjustly enriched; where a parent corporation that caused a sub's liabilities and its inability to pay for them would escape those liabilities; or an intentional scheme to squirrel assets into a liability-free corporation while heaping liabilities upon an asset-free corporation[.]

*Cf. id.* at 164. The principles in the last two scenarios apply here.

Of the $2.1 million in funds raised for RCC, over 80% went to Farmer and Johnson. It is certainly true that Plaintiffs did not secure individual guaranties when loaning RCC the $400,000. However, the risk Plaintiffs took did not require acceptance of improper corporate governance or self-dealing by the owners. The sham loans are the analytical lynchpin, in the Court's view.

The Pike loan came due in 2017. Per the undisputed record, in 2017 and 2018, Farmer and Johnson (standing on both sides of the LLC transaction, knowing the debt was nigh or due) loaned themselves a total of $479,000. Those loans took corporate money—money potentially available for creditors like Plaintiffs—and transferred it to the controlling owners. The "loan" vehicle employed by Farmer and Johnson is illusory and a sham. The payment due date is unfixed and contingent. Each "Borrower" has the power to treat the loans as forgiven, at its election. Further,

the owners simply signed each note, with no approval, LLC documentation, or sign of formal consent.[8] Investing in a start-up is risky, but the Pike Plaintiffs did not agree that Farmer and Johnson could simply live off the capital raise, make money unavailable through insider transfers, and then claim penury at the due date. The corporate veil here, if preserved, would work an injustice. Farmer and Johnson incurred the Pike liability for RCC but also took steps that benefitted them and made the loan uncollectible. Further, Farmer and Johnson maximized their personal benefits from RCC (through salary, rent reimbursement, meals/entertainment, and the fateful sham loans) in a way that occupied nearly all LCC assets. On this record, allowing that pattern (one that shows moral culpability) under the corporate shield would be unjust. Plaintiffs warrant judgment as to *Inter-Tel* step two.

### IV. Conclusion

Farmer and Johnson dominated the LLCs, resulting in loss of corporate separateness. Given their management and manipulation of LLC funds, recognition of the corporate veil would promote injustice in this scenario and as to these Plaintiffs. The Court **GRANTS** DE 48 and

---

[8] The Court has only the one Operating Agreement in the record. Interestingly, that 2017 Agreement (the year the loan came due) includes an overall development budget putting salaries and overhead—in total—at $400,000 in March of 2015. *See* DE 49-8 at 55 (Exhibit B). Thus, the LLC projected phasal costs from 2015 and included that in the 2017 Agreement. The *actual* practice, of course, as implemented by Farmer and Johnson, took the vast majority of capital raised as overhead/salary, far outside the Exhibit B budget. Again, there are no LLC documents modifying the budget, showing corporate consideration, or respecting the LLC apparatus as a separate decisionmaker in the process.

**DENIES** DE 49. The individuals shall be liable for the state court judgment against RCC in Plaintiffs' favor.

The parties must file a status report as to their intentions on the remaining claim, unjust enrichment, by no later than **September 20, 2022**. No party addressed that distinct claim in the summary judgment briefing.

This the 7th day of September, 2022.

**Signed By:**

_**Robert E. Wier**_

**United States District Judge**